**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOHN LESTER SALAZAR,

    Plaintiff,

vs.            No.  CV 00-841 JP/WDS

DANIEL P. SEAGRAVE, BELL,
IVERSON, STEVE RODRIGUEZ,
VINCE MARQUEZ and RICK McGAHIE,

    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 1, 2004 Defendants Will L. Bell, Jr. and David Iverson ("BCDC Defendants")

filed a Motion for Summary Judgment (Doc. No. 273), and Defendants Dr. Daniel Seagrave, Rick

McGahie, Steve Rodriguez, and Vince Marquez ("LVMC Defendants") filed a Motion for

Summary Judgment (Doc. No. 274).  The Court has carefully considered the pleadings, the

evidence of record, the relevant case law, and the arguments of counsel and of Plaintiff *pro se*.

The BCDC Defendants' Motion for Summary Judgment will be granted in part and denied in part.

The LVMC Defendants' Motion for Summary Judgment will be denied.

As an initial matter, on June 15, 2004 the BCDC Defendants filed a "Motion to Strike

Plaintiff's 'Amended Reply to Defendant's Bell and Iverson's Response to Plaintiff's Notice of

Supplemental Authority in Opposition to Defendants Motion for Summary Judgment.'" (Doc.

No. 340).  In addition to the usual briefs and exhibits in support of and in opposition to a motion

for summary judgment (opening brief in support, response, and reply), the parties have filed an

additional six (6) pleadings in connection with this motion for summary judgment.[1]  These

additional pleadings relate to the issue of exhaustion of administrative remedies, an issue brought

up in the motions for summary judgment.  Because Plaintiff's Amended Reply is related to the

exhaustion issue, and because it is merely an attempt to attach the intended exhibits to Plaintiff's

previous Reply, the Court will deny the motion to strike.

**Background.**  Plaintiff John Lester Salazar was incarcerated at the Bernalillo County

Detention Center ("BCDC") at various times in 1998.  On July 13, 1998 Plaintiff was transfered

temporarily for a pretrial competency evaluation to the forensic unit at the Las Vegas Medical

Center ("LVMC"), where he remained for some two months.  In his Amended Complaint,

Plaintiff alleges that while incarcerated as a pretrial detainee at BCDC in 1998, he was subjected

to excessive force at the hands of Defendants Iverson and/or Bell on three occasions.  Defendants

Iverson and Bell were employed as lieutenants at BCDC in 1998.  Plaintiff alleges that while at

LVMC he was subjected to excessive force by Defendants Seagrave, Rodriguez, Marquez, and

McGahie on two occasions.  In a winnowing process that has occurred over the years this case

has been pending, all other defendants and claims have been dismissed.  On March 8, 2002 this

Court denied, in part, a motion for summary judgment filed by Dr. Seagrave (Doc. No. 72), and

on September 4, 2002 the Court granted motions by Plaintiff for joinder of LVMC Defendants

---

[1]  These are:  (1) Defendants' Supplement to Exhibit I of their Motion for Summary Judgment (Doc. No. 298); (2) Defendants' Joint Notice of Supplemental Authority in Support of Their Motions for Summary Judgment (Doc. No. 319); (3) Plaintiff's Notice of Supplemental Authority in Opposition to Defendant's (sic) Motion for Summary Judgment (Doc. No. 328); (4) Defendants, Bell and Iverson's Response to Plaintiff's "Notice of Supplemental Authority in Opposition to Defendants' Motion for Summary Judgment" (Doc. No. 330); (5) Plaintiff's Reply to Defendant Bell and Iverson's Response to Plaintiff's Notice of Supplemental Authority in Opposition to Defendants (sic) Motion for Summary Judgment (Doc. No. 334); and (6) Plaintiff's Amended Reply to Defendant Bell and Iverson's Response to Plaintiff's Notice of Supplemental Authority in Opposition to Defendants (sic) Motion for Summary Judgment (Doc. No. 336).

Rodriguez, Marquez and McGahie, and of BCDC Defendants Bell and Iverson (Doc. No. 103).

In the latter Order, the Court also directed the Clerk to file Plaintiff's proposed amended

complaint (that had been filed on April 5, 2002) as Plaintiff's First Amended Complaint.  This

case is set for a non-jury trial beginning on January 18, 2005.

**Summary Judgment Standards.**

Summary judgment is appropriate only if there is no genuine issue as to any material fact

and  the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A

fact is "material" if, under the governing law, it could have an effect on the outcome of the

lawsuit.  *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a

material fact is "genuine"  where the evidence is such that a reasonable factfinder could return a

verdict for the nonmoving party.  Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir. 1994),

*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

When applying this standard, the Court examines the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing summary judgment.

Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

The moving party bears the initial burden of showing the absence of a genuine issue of material

fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Simms v. Oklahoma ex rel. Dep't of

Mental Health & Substance Abuse Serv., 165 F.3d 1321, 1326 (10th Cir. 1999).  Only then does

the burden shift to the non-movant to come forward with evidence showing that there is a genuine

issue of material fact.  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.

1991).  The non-moving party may not avoid summary judgment by resting upon the mere

allegations or denials of the party's pleadings.  Bacchus, 939 F.2d at 891.  To withstand a motion

for summary judgment, the non-movant must make specific reference to admissible evidence in the record.  *See* Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  A *pro se* party's verified complaint may be treated as an affidavit to the extent the allegations are detailed, not just conclusory.  Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

### A.  Discussion of BCDC Defendants' Motion for Summary Judgment.

#### 1.  *Plaintiff's Claims and Allegations.*

Plaintiff's claims of excessive force against Defendants Iverson and Bell arise out of three alleged incidents at BCDC on June 12, 1998, October 28, 1998, and October 29, 1998.  In regard to the June 12 incident, Plaintiff alleges that his cell was searched and his legal papers were thrown away.  Plaintiff further alleges that after complaining about the search and confiscation of his papers, he was injured when he was accosted in his cell, handcuffed, removed from his cell, and put into a strip cell.  In regard to the October 28 incident, Plaintiff alleges he was beaten and carried down several flights of stairs, placed in a small holding cell where he was handcuffed and strapped to a chair, and beaten and interrogated for four hours.  With respect to the October 29 incident, Plaintiff alleges he was attacked by guards in his cell, beaten, stripped of his clothing, choked with a blanket, and carried naked through the jail to a strip cell.

#### 2.  *BCDC Defendants' Grounds For Their Summary Judgment Motion.*

*a.  Exhaustion of Administrative Remedies.*  Exhaustion of administrative remedies is required by the Prison Litigation Reform Act ("PLRA"), which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

4

42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory, and it applies both to prison conditions cases and to cases involving allegations of excessive force.  Porter v. Nussle, 534 U.S. 516 (2002).  "[P]risoners need not engage in entirely fruitless exercises when no form of relief is available at all".  Ross v. County of Bernalillo, 365 F.3d 1181, 1187 (10th Cir. 2004).  However, exhaustion is required for actions seeking money damages even if the administrative process cannot provide monetary relief.  See Booth v. Churner, 532 U.S. 731, 740 (2001); Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) (prisoner must exhaust remedies even if they do not provide remedy sought).

The purpose of requiring a prisoner to seek administrative review by correction officials before filing a civil lawsuit is "to reduce the quantity and improve the quality of prisoner suits." Porter, 534 U.S. at 524.  It allows prison officials the opportunity to take corrective action that may satisfy inmates and reduce the need for litigation, filters out frivolous claims, and creates an administrative record to clarify the contours of claims and facilitate subsequent judicial review. Porter, 534 U.S. at 524-25; Ross, 365 F.3d at 1186; Steele v. Federal Bureau of Prisons, 355 F.3d 1204, 1207 (10th Cir. 2003).

The exhaustion requirement is not jurisdictional, Steele, 355 F.3d at 1208, nor is it an affirmative defense that can be waived if not pled by the defendant.  Id. at 1209.  The inmate must plead exhaustion in his complaint, id. at 1209-10, and must either attach a copy of the applicable administrative disposition, or describe with specificity the administrative proceeding and its outcome.  Id. at 1210-11.  A defendant may raise failure to exhaust in a motion for summary judgment.  Id. at 1212.  Prison officials are not required to advise prisoners of administrative remedies, as long as the remedies are available and the prison officials did nothing to frustrate or

prevent the prisoner from utilizing the procedure.  Yousef v. Reno, 254 F.3d 1214, 1221 (10th

Cir. 2001); *see also* Gonzales-Liranza v. Naranjo, 2003 WL 22255886, *3 (10th Cir. 2003)

(unpublished opinion) (rejecting prisoner's claim that unawareness of grievances procedure

excused PLRA's exhaustion requirement).  Section 1997e(a) of the PLRA contains a "total

exhaustion" requirement, meaning that "the presence of unexhausted claims in [a] complaint

require[s] the district court to dismiss [the] action in its entirety without prejudice."  Ross v.

County of Bernalillo, 365 F.3d 1181, 1189 (10th Cir. 2004).

Courts have recognized, however, that the PLRA exhaustion requirement by its terms

applies only to administrative remedies that are "available."  Thus, the requirement would not

apply if prison officials prevented the inmate from participating in the administrative process, or

thwarted such participation.  *See* Steele, 355 F.3d at 1207 (noting absence of allegation that

prison prevented from filing administrative claim); Hoover v. West, 2004 WL 309338, *3 (10th

Cir. Feb. 19, 2004) (unpublished) ("Where prison officials prevent or thwart a prisoner from

utilizing an administrative remedy, they have rendered that remedy 'unavailable' and a court will

deem that procedure 'exhausted'"); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("a

remedy that prison officials prevent a prisoner from  'utiliz[ing]' is not an 'available' remedy"

under PLRA).  Also, "the failure [by prison officials] to respond to a grievance within  the time

limits contained in the grievance policy renders an administrative remedy unavailable," Jernigan,

304 F.3d at 1032.  *See also* Lane v. Doan, 287 F. Supp. 2d 210, 212-13 (W.D. N.Y. 2003)

(prison officials failed to respond to, or to process, inmate's grievances and written complaints);

Liner v. Goord, 310 F. Supp. 2d 550, 553-54 (W.D. N.Y. 2004) (prison officials failed to comply

with prison's own procedural requirements); and Morris v. Eversley, 205 F. Supp. 2d 234, 240-41

(S.D. N.Y. 2002) (prison official failed to comply with procedures set forth in state law after inmate utilized informal channels).

     BCDC's administrative procedure is contained in its written Policy 13.1.9, Aff. Donald Crutchfield, Def. Ex. I.  The Policy allows inmates to file grievances about issues concerning their health and welfare.  Id. ¶ 3 at 1.  The Policy permits the inmate to appeal an adverse decision.  Id. ¶ 6 at 1.  Although the grievance procedure is not designed to provide a prevailing inmate with money damages, a successful grievance can result in the return of an inmate's property, rights or privileges, and/or discipline of corrections officers.  Id. ¶ 7 at 1.  Two exhibits attached to the affidavit of Mr. Crutchfield indicate that Plaintiff filed two grievances regarding the June 12, 1998 incident, but according to the affidavit of Mr. Crutchfield, Plaintiff "never filed any written grievance regarding the alleged use of excessive force by corrections officers on October 28 and 29, 1998."  Id. ¶ 8 at 2.  Further, Plaintiff "never exercised his right to appeal the denial of his grievances" regarding the June 12, 1998 incident.  Aff. Michael Sisneros ¶ 3.

     The BCDC Policy also states that after an inmate submits a grievance form to the case manager, the case manager forwards the complaint within two working days with his recommendation for resolution to the chairman of the grievance committee.  Policy § B.3. Ordinarily the chairman schedules a hearing within three working days, which the inmate may be permitted to attend at the chairman's discretion.  Id.  The inmate must be given a copy of the committee's response within 24 hours.  Policy § C.3.  An adverse decision may be appealed to the director of the facility within three days from the date the inmate receives the committee's response.  Policy § D.1.  In case of an appeal, the case manager is responsible for reviewing the file for completeness and forwarding the entire grievance file to the director within two working

days.  Policy § D.3.  A ruling on the appeal must be made by the director within five working days of his receipt, unless a formal hearing is held.  Policy § D.4.

Plaintiff alleges in his Amended Complaint that he "has not sought formal or informal relief from the appropriate administrative officials, regarding the acts complained about, in the herein above cause."  Am. Compl. ¶ 2 at 15.  He also alleges, however, that he has "exhausted available administrative remedies" and that "Plaintiff has been ignored, by all New Mexico Governmental Entities."  ("See attached proof of Exhaustion; see also Brief in support -- attached and ongoing").  Id. ¶ D(4) at 15; ¶ F(1) at 17.  Plaintiff contends that he fully complied with the grievance procedure but that BCDC officials lost or failed to process his paperwork or otherwise interfered with his ability to exhaust his administrative remedies.

In his October 22, 2003 deposition, Plaintiff was asked what he did to grieve or complain about the June 12, 1998 incident.  Plaintiff responded:  "I believe I filed grievances.  Every time an incident happened, I would ask for grievances and I would fill them out.  I believe you have them.  We gave you a list of grievances.  That's why we're trying to get the daily log and all the records from BCDC."  Depo. Salazar at 206.  When asked for specifics, Plaintiff was vague, but finally he stated:  "I did what they told me to do, and I did -- they said if you wanted the grievances, they would bring it to my cell and I would grievance it.  What they've done with it, if they've lost it, ..." Id. at 207.

In an affidavit, Plaintiff avers that after the June 12, 1998 incident, he was "placed in segregation ... for several months ... [and] after plaintiff was in segregation plaintiff files grievances.  Plaintiff also filled out an appeal form handed to the correctional officer because the plaintiff was locked down 24 hours a day."  Aff. Salazar, 4/13/04, ¶¶ 1-3.

8

As noted earlier, the record indicates that Plaintiff did, indeed, file a grievance relating to the June 12, 1998 incident by filling out two grievance forms, one dated June 12, 1998, and the other June 15, 1998.  On both forms, a response is written in the section provided for action by the committee, although this may actually be the recommendation by the case manager.  On the first form, a written response is signed by "L. Cook" and dated 6/18/98.  It states:  "Investigation conducted and completed and complaint is not with merit, as staff acted properly, and have a right to search his property and room."  Also on the first form the "no" box is checked beside the line that says "PROBLEMS RESOLVED," and this line is dated 6/23/98.  A written response on the second form is not signed; it states:  "Inmate Salazar was searched by staff, and not physically abused in any way.  He had contraband on his person and staff informed him that the contraband was unauthorized.  Staff acted properly as inmate was strip-searched.  Staff followed policy procedures."  On the second form the "no" box is checked beside the line that says "PROBLEMS RESOLVED," and this line is dated 6/25/98.  Plaintiff's signature does not appear in the section on either form that says "I DO WISH TO APPEAL."

However, Defendants have failed to produce evidence that BCDC complied with its responsibilities under the Policy.  For example, if the written response is the recommended resolution of the case manager, there is no evidence that the case manager forwarded the complaint within two working days to the chairman of the grievance committee.  There is no evidence whether the chairman of the committee scheduled a hearing within three working days.  Also lacking is evidence that Plaintiff was given a copy of the committee's response within 24 hours.  *See* Jernigan, 304 F.3d at 1032 (failure by prison officials to respond to grievance renders procedure "unavailable").

There is also evidence in the record that raises a genuine issue of fact about whether Plaintiff exhausted his available administrative remedies as to the October 28 and October 29 incidents.  In his deposition, Plaintiff testified that he filed grievances relating to the October 28 and 29, 1998 incidents, Depo. Salazar, Def. Ex. A at 221, 229-231, 411-14.  Although Plaintiff has not produced documents to verify this contention, he has raised an inference that his grievances may have been prevented or thwarted by BCDC.  *See* Hoover v. West, 2004 WL 309338, *3 (10th Cir. Feb. 19, 2004) (unpublished) ("prevent or thwart").

As to both incidents, Plaintiff avers:  "Plaintiff filled out grievances on these matters after he was placed into ... segregation, handed the grievances to correctional officers, but received no response.  Then Plaintiff asked for additional forms or other administrative remedies, but was denied by correctional officers ... who had complete control over plaintiff because plaintiff was in segregation, locked down 24 hours a day."  Aff. Salazar, 4/13/04, ¶ 10.  Plaintiff also alleges he remained in segregation for over eight months, was overmedicated, and was denied all his legal papers.  Id.

Plaintiff argues that the doctrine of laches applies to bar Defendants' late assertion that Plaintiff failed to exhaust his administrative remedies.  The Court rejects the laches doctrine.  If failure to exhaust cannot be waived by non-assertion, Steele, 355 F.3d at 1209, it goes without saying that it cannot be forfeited by tardy assertion.

BDCD Defendants' Motion for Summary Judgment will be denied because they have failed to demonstrate the absence of genuine issues of material fact on the issue of exhaustion of administrative remedies.  *See* Celotex, 477 U.S. at 323; Simms, 165 F.3d at 1326 (movant must show absence of genuine issue of material fact).  There is sufficient factual information in the

exhibits to raise a genuine issue of fact for trial on the issue of Plaintiff's exhaustion of his administrative remedies as to all three incidents at BCDC.  This issue will have to be resolved at the trial.[2]

   b.  *Involvement of Defendants Bell and Iverson in June 12 and October 28 Incidents.* The BCDC Defendants contend that neither Bell nor Iverson was involved in the alleged incident of excessive force on June 12, 1998.  Defendants further assert that Defendant Bell was not involved in the October 28 incident.  They seek clarification as to which Defendants are properly named in these two alleged incidents.

   *(1) The June 12 incident.*  There is no genuine factual dispute about Defendant Bell's non-involvement in the June 12 incident.  There are no allegations against Defendant Bell in the Amended Complaint regarding the June 12 incident, and Plaintiff admitted Bell's non-involvement in his deposition. Depo. Salazar, Def. Ex. A at 202, 283-84.

   There is a genuine factual dispute, however, whether Defendant Iverson was involved in the June 12 incident.  Defendants have produced evidence that Defendant Iverson was on vacation on June 12, 1998, Def. Ex. C, consisting of an affidavit of a payroll records custodian at BCDC and three pages from BCDC logs.  That evidence, albeit compelling, is not conclusive in the face of statements made by Plaintiff in his deposition in connection with the June 12 incident that he remembers Defendant Iverson grabbing and pushing him, beating him, slamming his head into a wall, and holding his head against a wall on June 12, 1998.  Depo. Salazar at 202-204, 208-209, 284-85.

---

[2]  The Court may decide to address these exhaustion issues as a preliminary matter before proceeding to the merits of the trial.

*(2) The October 28 incident.*  There are no allegations in the Amended Complaint against Defendant Bell in connection with the October 28 incident.  In his deposition, Plaintiff was asked if Lt. Bell was present at any point on that day.  Plaintiff answered, "I think he might have ... I believe Lieutenant Bell came in for a period of time in there.  ...  I'm not sure.  ...  I'm trying to remember.  ...  I remember they took some pictures of me.  ...  I don't know if Lt. Bell took those pictures, or maybe it was Garcia, Sgt. Garcia or somebody."  Depo. Salazar at 259-60.  The deposition continues:

> Q.  Because you're not sure if Lt. Bell was there, you're not sure whether he hit you at all that day, are you?
> A.  I'm not real sure.  He may have.  He may have.  It seemed like he was there that day.  ...  I'm not saying he was or he wasn't.  I believe he may have been there.  And if he was, he did do -- he did do beatings, because everybody in the room did the beatings when I was in there.
> . . .
> Q.  And like I said, you don't remember Lt. Bell being there. Right?
> A.  I'm not sure.  ...  It seemed like there was some higher brass there.  It seemed like it was there, and I'm trying to refresh my memory.  If he was there, he did do some of the beatings.

Depo. Salazar at 260, 362.  This testimony is so indefinite as to amount to mere speculation.  Earlier, Plaintiff testified that Lt. Bell was in the room when Plaintiff was in the restraint chair, and that Defendant Bell hit Plaintiff on the left shoulder.  Depo. Salazar at 218-220.  Plaintiff cannot create a question of fact with his own conflicting testimony.  *See* Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. ) (1986) (discussing sham questions of fact created by party's own conflicting testimony).

Therefore, the Court clarifies that there is no evidence to support Defendant Bell's involvement in the June 12 incident, and there is insufficient evidence to support Bell's

involvement in the October 28 incident.  There is, however, sufficient evidence to support

Defendant Iverson's involvement in the June 12 incident.

     *c.  Physical Injury.*  Under a 1996 amendment to the PLRA, prisoners may not recover

damages "for mental or emotional injury suffered while in custody without a prior showing of

physical injury."  42 U.S.C. § 1997e(e).  Defendants contend that Plaintiff suffered no more than

*de minimis* physical trauma as a result of the three incidents at BCDC, so that Plaintiff cannot

recover damages for mental or emotional injury.

     Section 1997e(e) has been construed "as a limitation on the relief a prisoner can receive

for injuries suffered while in custody."  Perkins v. Kansas Dept. of Corrections, 165 F.3d 803,

807 (10th Cir. 1999).[3]  Although mental and emotional distress damages are available under

§ 1983 actions, when the action is brought by a prisoner in custody, the prisoner must have

"suffered a physical injury in addition to mental or emotional harms."  Id.  The circuit courts that

have addressed the issue have imposed a standard of more than *de minimis* but less than

significant injury to satisfy the PLRA "physical injury" requirement.  *See, e.g.*, Mitchell v. Horn,

318 F.3d 523, 536 (3d Cir. 2003) ("We . . . requir[e] a less-than-significant-but-more-than-de

minimis physical injury"); Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002) (same); Siglar v.

Hightower, 112 F.3d 191, 193 (5th Cir.1997) (same).  In Oliver, a pre-trial detainee claimed he

experienced severe back and leg pain from overcrowded conditions in temporary cells, and that

another prisoner beat him in a fight.  The court held that the injuries plaintiff alleged were not

more than *de minimis*.  289 F.3d at 629.  The Siglar court held that where guards bruised a

---

    [3] On remand, the district court in Perkins found that the physical harm alleged by plaintiff, physical
deterioration as a result of worsening HIV, to be sufficient under § 1997e(e).  Perkins v. Kansas Dept. of
Corrections, 2004 WL 825299, *4 (D. Kan. March 29, 2004).

prisoner's ear during a search, and the ear remained bruised and sore for three days, the prisoner had only a *de minimis* injury.  112 F.3d at 193.

This Court adopts the standard announced in the circuit courts cited above.  Thus, Plaintiff must show he suffered more than *de minimis* physical injury to support his excessive force claim against the BCDC Defendants.

*(1) The June 12, 1998 incident.*  Plaintiff stated in his deposition that he had head injuries and neck injuries from the June 12, 1998 incident that were documented in a medical report. Depo. Salazar at 204-206.  He testified he received a "scratch" on his head when his head was slammed into and held against a wall, and there was blood from his head on the wall after the incident.  Id. at 208-209.  However, after the incident, Plaintiff was seen by medical personnel at BCDC who found no evidence of any trauma to Plaintiff.  Def. SOMF 10.  A physician's order sheet dated June 12, 1998 indicates an observation by medical personnel of "tenderness on palpation to [left lower] rib cage & [left] shoulder but no evidence of any trauma, [zero] bruising, [zero] swelling, [zero] deformity, ROM good" and an assessment of "normal exam [no] trauma." Def. Ex. D.

Tenderness in a shoulder and over the rib cage, and a scratch on the head, are insufficient to meet the standard of more than *de minimis* physical injury for the June 12, 1998 incident. Therefore, the Court will grant partial summary judgment to the BCDC Defendants with respect to the June 12 incident.

*(2) The October 28, 1998 and October 29, 1998 incidents.*  Plaintiff's medical records from October 28, 1998 reflect that a BCDC medical services unit nurse found Plaintiff had no injuries and therefore cleared Plaintiff for psychological services unit placement.  Def. SOMF 16.

A standard referral form dated 10/28/98 issued to "PSU/Security" from "MSU-1" states: "Pt. is cleared for Security / PSU placement."  Def. Ex. F.

Plaintiff has countered this evidence with his deposition testimony that a person named Roselyn saw Plaintiff in a strip cell.  It is unclear whether this passage is referring to the Oct. 28 or Oct. 29 incident.

> She took a full report and recommended that I call my parents and get to an outside doctor.  And she called -- made me also see their doctors in medical and said that she would testify as to what she saw, and that I was in a strip cell with no clothes on, and documented all the bruises and cuts and lacerations on my body.

Depo. Salazar at 228.

Plaintiff also refers to a medical record by Rick J. Gehlert, M.D. dated Nov. 9, 1998 that states in the history section:  "[Plaintiff] apparently had two anxiety attacks, one on October 28th and one on October 29th, which resulted in physical restraint by prison guards and multiple contusions about the trunk and upper extremities.  The patient is now complaining of bilateral shoulder pain, rib pain and low back pain since these attacks."  Pl. Ex. G.  Dr. Gehlert's examination revealed "ecchymosis" (bruising) and pain around the front rib cage area, with "significant pain over his left AC joint and limited active motion of both shoulders of about 90 degrees with significant pain."  Id.  Also, there was "some paraspinal pain on the right side of his lumbar spine."  Id.  Dr. Gehlert prescribed physical therapy and "an appropriate nonsteroidal." Apparently Plaintiff did not receive the physical therapy and nonsteroidal medication that Dr. Gehlert prescribed for several weeks, if ever.  Pl. Ex. H at 2, 3, 4.  Plaintiff's ex-wife, Cheryl Ryerson, testified:  "I had noted in BCDC that one of the medical assistants brought it to the attention of the physician that there was something going on, desperately going on."  Depo.

Ryerson, Pl. Ex. C at 50.  Also, Ms. Ryerson alluded to a jail visit by Steve Long who reported that Plaintiff was "pretty beat up."  Id. at 69.

The record indicates that Plaintiff was neither sent to the hospital for injuries nor given painkillers or aspirin following the October 29, 1998 incident.  Def. SOMF # 20; Depo. Salazar at 398.  Physician's Order Sheets dated October 29, 1998 reflect Plaintiff was alert and "both wrists showed zero swelling, zero deformity, and zero erythema [redness]; mild bilateral tenderness; full range of motion; and full neurovascular."  Def. SOMF 21; Def. Ex. H.  The record noted multiple scratches, abrasions, and evolving bruises.  Id.  Plaintiff's alleged injuries required "no treatment." Id.  However, the first page of the physician's order sheet also indicates "[illegible] knees and as noted to torso & face."  Def. Ex. H.  Drawings of the head and body on this sheet have numerous markings in several areas.  The severity of these findings is difficult to discern from this document without live testimony.  Additionally, there is another line of text in the assessment section of this sheet that is completely illegible.

Considering these facts in a light most favorable to Plaintiff, the Court believes there is sufficient evidence to meet the *de minimis* standard as to the October 28 and 29 incidents, although this is a close question.  With respect to those incidents, Defendants failed to show the absence of a material fact as to the extent of Plaintiff's physical injury.  While there are issues of proximate causation with regard to some of Plaintiff's injuries, the extensive bruises, swelling, and reported pain lasting several days following those incidents, may amount to real physical injury. *See* Mitchell v. Horn, 318 F.3d at 535-36 ("we do not adopt a test that would prevent those experiencing real physical injury at the hands of government officials from pursuing their rights"). Therefore summary judgment will be denied as to the October 28 and 29, 1998 incidents.

     *d.  Qualified Immunity.*  Defendants Bell and Iverson contend they are entitled to qualified immunity because their alleged use of force against Plaintiff does not rise to the level of a Fourteenth Amendment violation.  Qualified immunity shields an individual government official performing discretionary functions from liability for civil damages insofar as his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Butler v. City of Prairie Village, 172 F.3d 736, 745 (10th Cir. 1999).  When a defendant asserts qualified immunity, a court must first determine whether the plaintiff has asserted a violation of a constitutional right.  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (*citing* Wilson v. Layne, 526 U.S. 603, 609 (1999)).  If a favorable view of the facts shows the plaintiff has asserted a constitutional violation, the court must then determine whether that right was "clearly established" at the time of the challenged conduct.  Medina, 252 F.3d at 1128; Holland v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001).  If both these elements are satisfied, it is the defendant's burden to establish the absence of a disputed material fact as to whether the defendant's conduct was objectively reasonable in light of the law and the defendant's knowledge at the time of the conduct.  Salmon v. Schwarz, 948 F.2d 1131, 1136 (10th Cir. 1991).

     The due process clause of the Fourteenth Amendment, rather than the cruel and unusual punishment clause of the Eighth Amendment, applies to excessive force claims brought by pretrial detainees.  Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1998).  Even though pretrial detainees are not protected by the Eighth Amendment, they retain at least the same constitutional rights as those enjoyed by convicted prisoners.  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  The dispositive question is whether the challenged conduct constitutes punishment or is reasonably

related to a legitimate governmental objective.  Block v. Rutherford, 468 U.S. 576, 583-84

(1984).  In order for a plaintiff to succeed on an excessive force claim, he must show the

deprivation is "sufficiently serious" and the prison official in question acted with "deliberate

indifference" to his health and safety.  Penrod v. Zavaras, 94 F.3d 1399, 1405-06 (10th Cir.

1996). "Deliberate indifference" may be shown by the official's active personal participation, or by

his knowing acquiescence in the constitutional violation.  See Holland v. Harrington, 268 F.3d

1179, 1187 (10th Cir. 2001).  The Court applies two prongs in its qualified immunity analysis in

excessive force cases, an objective prong that asks if the alleged wrongdoing was objectively

harmful enough to establish a constitutional violation, and a subjective prong under which the

plaintiff must show that the officials acted with a sufficiently culpable state of mind.  Smith v.

Cochran, 339 F.3d 1205, 1212 (10th Cir. 2003).  "[W]hether an official protected by qualified

immunity may be held personally liable for an allegedly unlawful official action generally turns on

the 'objective legal reasonableness' of the action."  Anderson v. Creighton, 483 U.S. 635, 639

(1987).  The focus is less on the extent of resultant injury to the prisoner than on the amount of

force used.  See Hudson v. McMillian, 503 U.S. 1, 4 (1992) (use of excessive physical force

against prisoner maliciously and sadistically to cause harm may constitute cruel and unusual

punishment even though prisoner does not suffer serious injury); see also Whitley v. Albers, 475

U.S. 312, 319-22 (1986) (unnecessary and wanton infliction of pain violates 8th Amendment);

Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990) (8th Amendment includes duty

to protect prisoners from excessive force).

*(1) The June 12, 1998 incident.*[4]  With respect to the June 12 incident, Defendants assert

that BCDC officers searched Plaintiff's jail cell, and that Plaintiff was not injured.  Def. SOMF 7,

10.  Plaintiff testified in his deposition that when his cell was searched the correction officers,

including Defendant Iverson, took all his legal work and threw it in a garbage can, calling it

contraband.  Depo. Salazar at 198.  When Plaintiff complained, the COs slammed Plaintiff against

the wall and beat him.  Id. at 202, 203.  Defendant Iverson punched Plaintiff in the face, and the

other COs were hitting Plaintiff as he tried to protect himself from the blows.  Id. at 284.  As

Plaintiff was being handcuffed and shackled, Defendant Iverson held Plaintiff's head against the

wall, and there was blood on the wall at that location.  Id. at 202, 203, 204, 206.  Plaintiff had a

"scratch" on his head.  Id. at 208.  The COs had "shock shields" and hit Plaintiff with batons.  Id.

at 209.  Then they moved him by force to a strip cell.  Id. at 199, 203; Am. Compl. at 3.  The two

handwritten grievance forms that relate to the June 12 incident, Def. Ex. I, are difficult to

decipher.  Plaintiff claims force was used and he suffered bruises, but the thrust of those

complaints seems to be the loss of his legal papers.

It is clear from the undisputed facts that Plaintiff was very upset about the removal and

destruction of his legal papers, and that some force was necessary to deal with Plaintiff's

disruptive behavior on June 12, 1998.  However, taking the evidence in the light most favorable

to Plaintiff, the force used may have been excessive under the circumstances, Defendant Iverson

subjectively may have acted with malice, or he may have allowed the infliction of unnecessary and

wanton pain on Plaintiff by the other COs.  Thus, the evidence is sufficient to assert a violation of

---

[4] Even though the Court is granting summary judgment on this claim because there was no more than *de minimis* physical injury, the Court elects to include the June 12 incident in its qualified immunity analysis.

the Fourteenth Amendment and the Court will deny qualified immunity to Defendant Iverson with

respect to the June 12 incident.  However, because partial summary judgment is being granted to

the BCDC Defendants with respect to the June 12 incident, there will be no evidence admitted at

the trial regarding that incident.

    *(2) The October 28, 1998 incident.*  This incident occurred in a pod on the 6th floor of

BCDC.  Plaintiff admits he probably had a panic attack.  Depo. Salazar at 321.  While being

questioned by a counselor, Paul Siewert, about his recent contact with a TV station, Plaintiff

became agitated and disruptive; Plaintiff's conduct appeared to cause another inmate to attack the

counselor.  Def. Ex. E.  Plaintiff refused to return to his room, and officers used force to restrain

Plaintiff.  Id.  Plaintiff's version (Depo. Salazar at 339-342) is that several officers, including Lt.

Iverson, responded to an emergency call regarding this incident.  Defendant Iverson got to

Plaintiff first, hitting Plaintiff several times and knocking him real hard to the floor.  He hit

Plaintiff in the face and shoulder.  Then other COs came in and were all on top of Plaintiff, beating

him with their hands and batons and stun shields.  After that, they handcuffed and shackled

Plaintiff.  Plaintiff testified he was not resisting the officers, just curled up trying to protect

himself.  Id. at 342.  The officers then walked Plaintiff out of the pod down to the first floor,

where they placed Plaintiff in a pro-restraint chair.  Plaintiff claims that while he was in the

restraint chair, Defendant Iverson and others interrogated and beat him for 4 - 4 1/2 hours.  Id. at

352; Aff. Salazar, 4/13/04 ¶ 18 at 2..

    While some force was unquestionably necessary to calm and control Plaintiff and remove

him from the 6th floor pod, the alleged conduct of the COs cannot be said to be objectively

reasonable under the circumstances, when viewed in a light most favorable to Plaintiff.  If this

version of events is credible, this conduct may have violated the Fourteenth Amendment.
Additionally, gratuitous beating while Plaintiff was strapped in a restraint chair may constitute
malicious intent.

     *(3) The October 29, 1998 incident.*  This incident began in Plaintiff's cell.  Plaintiff admits
he probably had another panic attack on this day, Depo. Salazar at 321, and he had to be
restrained by officers because of his disruptive, combative and uncooperative behavior, and
because he was threatening suicide.  Def. Ex. G.  Plaintiff's version is that Defendant Iverson
came into his cell to question him about his contact with the TV station the day before, and when
Plaintiff refused to discuss it, Iverson threatened to kill Plaintiff. Depo. Salazar at 375-77.  Then
other officers entered the cell and beat Plaintiff with batons and shock shields for 15-20 minutes
"with Iverson in the lead."  Id. at 378-79.  Defendants Iverson and Bell beat Plaintiff with their
fists, which Plaintiff described as "maybe just a total all-out assault, attack, like you would beat
someone -- really beat someone to hurt them really bad.  I collapsed to the floor, and they
continued to beat me."  Id. at 378-79.  Plaintiff was then handcuffed and shackled and stripped
naked.  Id. at 380.  Defendant Bell threatened to rape Plaintiff as other COs were holding Plaintiff
against a wall and gesturing and chanting their encouragement to Bell.  Id. at 383-84.  Defendant
Iverson tried to kill Plaintiff by choking him with a blanket.  Id. at 387-88.  Plaintiff passed out,
and when he came to he was dangling naked in the air, being carried out to another cell.  Plaintiff
was "bleeding real bad on my wrists and then on my ankles."  Id. at 395.  He was left naked in a
cold cell until a person named Roselyn intervened.  Id. at 397.

     In a handwritten note that may relate to this incident, fellow inmate Fidel Pacheco states
"they carried out Mr. John Salazar out in a mean way where he was handcuffed by his feet and

wrist to the back of his body and easily could have broken both of his arms and also he was carried out in the nude . . .."  Pl. Ex. D.

The evidence of this conduct, taken in the light most favorable to Plaintiff, is sufficiently serious to establish a violation of the Fourteenth Amendment.  Further, disputed questions of fact exist about Defendants Iverson's and Bell's subjective intent in quelling this disturbance.  Therefore summary judgment will be denied as to the October 28 and 29, 1998 incidents on the ground of qualified immunity.

*e.  Other Claims Precluded.*  The BCDC Defendants seek clarification that any other purported claims against other BCDC personnel would fail because they have not been named as Defendants and the statute of limitations has run on such claims.  In a similar vein, the BCDC Defendants contend that to the extent Plaintiff purports to assert governmental liability or official capacity claims under 42 U.S.C. § 1983 relating to his incarceration at BCDC, those claims fail because Plaintiff cannot prove his alleged injuries were caused by a governmental policy or custom.  The Court agrees and clarifies that no other claims arising from Plaintiff's incarceration at BCDC are involved in this case.

**B.  Discussion of LVMC Defendants' Motion for Summary Judgment.**

Plaintiff's claims of excessive force against the LVMC Defendants arise out of two alleged incidents at LVMC on September 1, 1998 and on September 8, 1998.  The LVMC Defendants (Seagrave, McGahie, Rodriguez and Marquez) base their motion for summary judgment on two grounds.  The first ground is that Plaintiff cannot recover for his injuries under the PLRA for the September 1, 1998 incident because his physical injuries were *de minimis*, and the second ground is that Plaintiff failed to exhaust his administrative remedies.

    1.  _De minimis_ physical injuries.  These Defendants assert Plaintiff's claimed physical injuries that resulted from the September 1 incident are no more than _de minimis_.[5]  They argue that the evidence "demonstrate[s] conclusively that Plaintiff did not have any real physical injury."  Def. Br. at 4.

    The record shows that on September 1, 1998 Plaintiff was undergoing a pretrial psychiatric evaluation at LVMC.  Def. SOMF 1; Am. Compl. at 6.  Plaintiff asserts that on that day he was assaulted by the LVMC Defendants while he was being transported to the hospital's Secure Treatment Unit ("STU").  Am. Compl. ¶ 3.  Plaintiff attempted to hide under a table to avoid transport because he feared being placed in a strip cell.  Def. SOMF 2; Depo. Salazar, Def. Ex. A at 75, 81.  Because he was resisting, several people were required to restrain and transport Plaintiff.  Def. SOMF 3; Depo. Salazar at 84-85.  Plaintiff was flailing his limbs in his attempt to resist.  Def. SOMF 4; Depo. Salazar at 85-86.  Several times Defendants attempted to lift Plaintiff but they dropped him because they were unable to get a good grip on him; once when Defendants lost their grip on him, Plaintiff's leg and hip hit a door.  Def. SOMF 7; Depo. Salazar at 87, 93.  Plaintiff received a cut by hitting something sharp in a door or door frame while he was being transported.  Def. SOMF 8; Depo. Salazar at 106.

    The next day, September 2, Plaintiff complained that he had been physically abused the day before while being transported to the STU, which complaint was promptly investigated by Carmela Montoya, an investigator for LVMC.  Def. SOMF 9; Aff. Montoya, Def. Ex. B ¶ 1.  Ms. Montoya examined and took Polaroid photographs of Plaintiff's cuts and bruises on September 2 and 3, 1998.  Def. SOMF 10; Aff. Montoya ¶ 2.  Ms. Montoya concluded that Plaintiff's injuries

---

[5]  The motion for summary judgment addresses only the Sept. 1, 1998 incident, not the one on Sept. 8.

were of a "light bruising nature" and were "extremely minimal", consistent with Plaintiff having

resisted and struggled during the transport.  Def. SOMF 11, 12; Aff. Montoya ¶¶ 3, 4.  Plaintiff

had bruises located mostly on his wrists and ankles, and around his abdomen or chest area where

the LVMC staff held Plaintiff to restrain and transport him.  Def. SOMF 12; Aff. Montoya ¶ 4.

Several pages of photographs of Plaintiff taken by Ms. Montoya on September 3, 1998, Ex. 1

(attached to Def. Ex. B), do not appear to show significant bruising, although they are of poor

quality and do not even show the bruises and swelling described in Ms. Montoya's handwritten

notes on the photographs.

In his deposition, Plaintiff testified that he received a cut on his side, "like a scratch or a

cut."  Pl. Ex. D, Depo. Salazar at 105.  The cut was from hitting something sharp on the door or

hinges in the doorframe.  Id. at 106.  Plaintiff also remembers that during the transport there were

blows to his stomach and to his side from Defendant Rodriguez who seemed to be angry at

Plaintiff, screaming at him almost demonically.  Id. at 96-97.  Plaintiff's perception was that the

Defendants were hitting Plaintiff and beating him up just for kicks, even though they had complete

control of him.  Id. at 98.  Defendant Rodriguez also hit Plaintiff in his groin area and his back

area, as well as his legs and arms.  Id. at 98-99.  Dr. Seagrave also participated in hitting Plaintiff,

as did other staff that were involved in the transport.  Id. at 99, 101-103.

Miguel Chavez, an advocate with the agency Protection and Advocacy System, testified in

his deposition that he saw Plaintiff on September 3, 1998 and generated a letter that he sent to the

investigations department of the LVMC.  Pl. Ex. E, Depo. Chavez at 14.  In his letter, Mr.

Chavez stated that he "observed that [Salazar] had numerous bruises and abrasions to the upper

body [and] Mr. Salazar's inner wrists were bruised and swollen (2 x 3 inch area), his left mid-

chest area was bruised (1 x 3 inches area), and his right rib cage was bruised and swollen (4 x 6 inch area)." Id. at 15; Pl. Ex. C.  Photographs of Plaintiff taken by Sgt. Robert R. Sanchez on September 8, 1998 show large areas of dark bruises on Plaintiff's chest, arms, side, back, legs and ankles, as well as some swelling.  Pl. Ex. F.  A physician's order sheet dated September 9, 1998, attached to a *Martinez* report, noted that Mr. Salazar had "old, ~ 10-7 day resolving hematomas". Ex. BB attached to Defs. MR, referred to in Mem. Op. & Order, 3/8/02 (Doc. No. 72) at 7. Thus, although these photographs were probably taken after the separate incident on September 8, the injuries they show may have resulted from the September 1, 1998 incident.

In a Memorandum Opinion and Order filed March 8, 2002 (Doc. No. 72), this Court denied a motion for summary judgment by Defendant Seagrave.  Dr. Seagrave had asserted "that any injuries resulting from Mr. Salazar's transfer to the STU [on Sept. 1] are *de minimis* and not indicative of excessive force."  Mem. Op. & Ord. at 8.  In denying the motion (in part), the Court reviewed the evidence of record and found that

> Mr. Salazar here has shown a dispute of material fact which, when viewed in his favor, is sufficient to defeat Dr. Seagrave's motion for summary judgment on the claim of excessive force.  . . . In addition, there are genuine issues of fact concerning the extent of injury suffered by Mr. Salazar [that] presents a credibility dispute that cannot be resolved through summary judgment proceedings."

Mem. Op. & Order at 9.

The LVMC Defendants have failed to show the absence of a material factual question under the PLRA standards discussed above.  They have not explained how the factual record as it exists now removes the "credibility dispute" on the same issue that caused the Court to deny summary judgment in 2002.

Defendants argue that "it is clear that the Plaintiff is responsible for his injuries because he struggled so strenuously."  Def. Br. at 4.  However, there is a factual dispute as to causation of Plaintiff's injuries.  Viewing the evidence in a light most favorable to Plaintiff, the alleged injuries from the September 1 incident are sufficient to meet the *de minimis* standard of the PLRA.  Therefore the Court will deny summary judgment for the LVMC Defendants on this ground.

2.  <u>Exhaustion of administrative remedies</u>.  These Defendants do not assert that LVMC had an administrative procedure for grievances or that Plaintiff failed to pursue a grievance for the incidents at LVMC.  Rather, these Defendants assert only that because Plaintiff failed to exhaust his administrative remedies at BCDC, his claims against the LVMC Defendants should be dismissed as well.  For the reasons discussed in connection with the BCDC Defendants' Motion for Summary Judgment, the Court will deny summary judgment for the LVMC Defendants on this ground.

THEREFORE IT IS ORDERED:

1.  Defendants Bell and Iverson's Motion to Strike Plaintiff's "Amended Reply to Defendant's Bell and Iverson's Response to Plaintiff's Notice of Supplemental Authority in Opposition to Defendants Motion for Summary Judgment," filed June 15, 2004 (Doc. No. 340) is DENIED.

2.  Defendants Bell and Iverson's Motion for Summary Judgment (Doc. No. 273) is GRANTED IN PART in that:  (a) Partial Summary Judgment will be granted to Defendants Bell and Iverson on the excessive force claim as it relates to an incident at BCDC on June 12, 1998; and (b) Partial Summary Judgment will be granted to Defendant Bell on the excessive force claim

as it relates to an incident at BCDC on October 28, 1998; and in all other respects, Defendants Bell and Iverson's Motion for Summary Judgment is DENIED.

3.   Defendants Seagrave, McGahie, Rodriguez, and Marquez's Motion for Summary Judgment (Doc. No. 274) is DENIED.

SENIOR UNITED STATES DISTRICT JUDGE